## CHUNES v. DULUTH, W. & P. RY. CO.

(District Court, D. Minnesota, Fourth Division. March 3, 1924.)

1. **Attorney and client ⟨⟩74—From contradictory affidavits of plaintiff and two firms of attorneys, court unable to find that either firm had authority.**

Where three personal injury actions on same cause of action, brought in different state courts by two firms of attorneys, were removed to federal court, on defendant's motion to require attorneys to show authority, *held* that, from plaintiff's self-contradictory affidavits and contradictory affidavits of respective attorneys, showing that one of them was committing perjury, subornation of perjury, fraud, and deceit, court was unable to find that either firm had authority to commence actions, and actions were therefore dismissed.

2. **Attorney and client ⟨⟩32—"Ambulance chasing" is violation of ethics of profession.**

Practice of "ambulance chasing" is violation of ethics of legal profession, branding those who indulge in it with professional infamy.

At Law. Action by George Chunes against the Duluth, Winnipeg & Pacific Railway Company. On defendant's motion to require attorneys representing plaintiff in three actions brought on same cause of action to show by what authority they brought and appeared therein. Actions dismissed.

McGEE, District Judge. On March 20, 1923, Messrs. Dahl & McDonald, attorneys at law, residing and practicing law in the city of Minneapolis, Minn., commenced this, a personal injury action, in the district court of Dakota county, Minn. The case was removed to this court on the ground of diversity of citizenship of the parties. Thereafter a motion was made on behalf of the plaintiff to remand the case to the state court on the ground that the complaint states a cause of action under and within the provisions of the federal Employers' Liability Act (Comp. St. §§ 8657–8665), and under the terms of that act is not removable. The motion to remand was denied. See Chunes v. Duluth W. & P. Ry. Co. (D. C.) 292 Fed. 153.

A second action on the same cause of action was commenced in the name of the plaintiff by the same attorneys in the district court of Wright county, Minn., on March 26, 1923, and was also removed to this court, and is now pending. A third action on the same cause of action was commenced on March 29, 1923, in the district court of St. Louis county, Minn., in the name of the plaintiff, by Messrs. Barton & Kamuchey, attorneys at law, residing and practicing law in St. Paul, Minn., which action was removed to this court. A motion to remand was made and denied.

There are, therefore, pending at this time in this court three actions based on the same cause of action, brought by two different firms of attorneys, both claiming authority from the plaintiff to represent him in commencing the same. The practice of bringing a number of different actions on the same cause of action in courts in different parts of the state of Minnesota was condemned by this court in Savarin v. Union Pac. R. Co. (D. C.) 292 Fed. 157, 161, 162, and it was very plainly indicated that severe disciplinary action would follow an indulgence in that practice. In that case it was said:

⟨⟩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

"As hereinbefore stated, this case was commenced on January 13, 1923, in the district court of Faribault county, in Southern Minnesota. Three days later, on the 16th day of January, 1923, exact copies of the summons and complaint herein were filed and an action commenced on the same cause of action in the district court of Stevens county, in Northern Minnesota. In other words, within three days the same attorneys commenced two cases on the same cause of action in different parts of the same state. It is a matter of common knowledge that this practice in growing in Minnesota, and seems to be confined to attorneys who specialize in personal injury litigation, and largely to cases imported into Minnesota from foreign states.

"The object and purpose of the practice seems to be to ascertain the counties in which juries are most liberal in fixing damages in the class of cases mentioned. While in the present case only two cases have been commenced on the same cause of action, in other instances it is understood that as high as four or five cases have been commenced in as many different counties; the summons and complaint being identical in all of them. This practice requires defendants to retain counsel and to appear and answer in each case, and, if they are removable cases, to effect a removal of the same to this court, thus unreasonably increasing the work in the clerk's office and further congesting calendars already badly congested.

"The two cases now before the court aptly illustrate the effect of this practice on the litigants and the court; that is, instead of one there are two cases, two removable proceedings, two motions to remand, and two motions to vacate the service of the summons. In other words, there is an increase of 100 per cent. in the expense of the litigation to the defendants, and in the work of the clerks of both courts and of the court itself. It is a course of conduct that cannot be justified. It is at war with generally accepted ideas of professional ethics, propriety, and decency. The judges of this court have had this matter under consideration and are in agreement on the proposition that the practice mentioned is a gross abuse of the process and machinery of both the national and state courts, and, if further pursued, this court will feel called upon to resort to disciplinary methods sufficient in severity to effectually put an end to the practice."

[1] The defendant, conceiving that it had just cause to complain that it was being harassed in the matter and put to the unnecessary and burdensome expense of appearing in three different state courts in widely separated parts of the state, and forced to resort to removal proceedings in three different cases, all founded upon the same cause of action, and in this court to meet three motions to remand the cases to the state court, submitted a motion to require the two firms of attorneys mentioned to show by what authority they commenced and appear in the actions mentioned.

Messrs. Dahl & McDonald, on the hearing of the motion, submitted an affidavit which, if true, would show adequate authority in them to commence the action. The affidavit is as follows:

"Robt. J. McDonald, being first duly sworn, upon oath deposes and says:

"(1) That he is a member of the firm of Dahl & McDonald, Attorneys at Law, Minneapolis, Minn., who are the attorneys for the above-named plaintiffs; that on the 26th day of February, 1923, the firm of Dahl & McDonald were retained in the above-entitled action by plaintiff, and at said time plaintiff and Dahl & McDonald, by this affiant, made the following contract, copy of which is hereto attached and marked Exhibit A:

"'John F. Dahl.                                    Robt. J. McDonald.

"'Dahl & McDonald, Attorneys at Law,
"'327 Metropolitan Bank Bldg., Minneapolis, Minn.
"'Telephone Atlantic 7978.                      February, 26, 1923.

"'I hereby retain and employ Dahl & McDonald as attorneys at law to recover damages for personal injuries sustained by me, Geo. Chunes, on or about February 15, 1923, at or near Bartlett, Minn., through the negligence

of D., W. & Pac. Ry. Co., and I agree to pay them for said services a sum equal to 33⅓ per cent. of the amount finally recovered, but no settlement of said claim shall be made without first securing my written consent thereto.

" '[Signed]        George Chunes, Claimant,

" 'We hereby accept the above claim and cause of action and agree to prosecute the same to settlement or judgment, on the terms above set forth.

" 'Dahl & McDonald, by Robt. J. McDonald.'

"(2) That at the time of making said contract plaintiff informed affiant of all details with reference to the accident, gave your affiant the names of witnesses, and all information necessary to conduct an investigation and proceed with said law suit.

"(3) That immediately after obtaining said contract said Dahl & McDonald. duly made an investigation of facts and started an action for damages against said defendant in the district court of Dakota county.

"(4) That said action was removed by defendant to the United States District Court, Third Division, and that Dahl & McDonald moved said court to remand said action back to the district court of Dakota county, which was denied; that thereafter said Dahl & McDonald duly commenced·an action in the district court of Wright county; that said action was duly removed to the United States District Court, Fourth Division( by this defendant; and that said Dahl & McDonald made a motion to have said cause removed back to the state court, and said motion is still to be determined.

"(5) That, within a short time after the employment of Dahl & McDonald by the plaintiff herein, one Kamuchey, who is a member of the firm of Barton & Kamuchey, attorneys at St. Paul, called to see plaintiff at a hospital in Duluth, and solicited plaintiff's case, and at said time plaintiff informed said Kamuchey that he had already employed Dahl & McDonald as his attorneys, and refused to give the firm the case; that plaintiff in this action is of Greek nationality, and that said Kamuchey is also of Greek nationality; that thereafter said Kamuchey had a gambler, who was also of Greek nationality, and who is acquainted with the plaintiff, go to the hospital with him to see plaintiff, and after some time, by various inducements, and informing plaintiff that said Dahl & McDonald were unreliable, and various other things unnecessary to be mentioned herein, plaintiff finally signed a contract with Barton & Kamuchey; that thereafter said Kamuchey drew up a dismissal, and had plaintiff sign the same, and caused said dismissal to be mailed to Dahl & McDonald; that after receiving said dismissal your affiant went to the city of Duluth to interview plaintiff regarding same, who disclosed the above facts, and plaintiff at that time informed your affiant that he acted contrary to his wishes, and was induced to take the action he did because said Kamuchey informed plaintiff that the only one who could get the witnesses to assist him in the case would be Kamuchey, because he was of Greek nationality; that plaintiff informed affiant at that time to proceed with the case, and that he would inform Barton & Kamuchey to take no further action in the matter; that your affiant has been at the hospital in Duluth on various occasions since that time, and at all times plaintiff has indicated and expressed his willingness that Dahl & McDonald proceed with said cause, and has informed affiant that he does not want Barton & Kamuchey to take any action whatever and that he has so informed them.

"(6) That the foregoing is made for the purpose of showing the court the authority given Dahl & McDonald for the bringing of the action herein mentioned, and representing plaintiff, and showing to the court the true facts under which Barton & Kamuchey claim to represent plaintiff.

"Further affiant sayeth not.        Robt. J. McDonald.

"[Notarial Seal.]

To meet and controvert the allegations of that affidavit there was submitted an affidavit purporting to have been subscribed and sworn to by the plaintiff on the 11th day of May, 1923, and an affidavit by one James Kontogianis dated the 21st of May, 1923. The affidavit purporting to be that of the plaintiff is as follows:

"George Chunes, being first duly sworn, upon oath deposes and says that he now is, and for the last past three years has been, a resident of the state of Minnesota; that he is 28 years of age, a single man, and that his occupation has been heretofore that of a railroad track laborer; that heretofore. and prior to February 15, 1923, he was employed by the Duluth, Winnipeg & Pacific Railway Company, and was working for it as a section hand, and was stationed at said company's section situated at the town of Nopemi, in the county of St. Louis, and state of Minnesota; that on the 15th of February, 1923, and while he was so working for said company at a place about 20 miles north of the said town of Nopemi, he was run over by one of said company's trains, and as a result thereof his right leg was amputated close to the hip, the bones of his left shoulder were broken, the bones of his toes of his left foot were crushed and broken, and he was otherwise badly bruised about the head and body; that immediately after sustaining the said injuries he was taken to St. Mary's Hospital, at Duluth, Minn.; that thereafter, and on Sunday, February 25, 1923, two men came to the hospital and asked him to tell them how the accident happened, and that he was then and there and at that time under severe pain and suffering; that he was asked questions by one of these men and gave answers pertaining to his said injuries, and that after answering a number of questions, which were taken down by one of these men, he was then asked by this same man to sign a paper which was presented to him by this man, and which said paper was held by the said man and the biggest portion of it was covered by him; that before signing this paper he was told by this man that this paper was a statement of facts as to how he got hurt; that your affiant then signed the said paper, and after signing it he was then told by this man that he was one of a firm of lawyers from Minneapolis, and that he would like to take the handling of your affiant's case; that your affiant then told him that he, your affiant, was a very sick man, and that he had a lot of pain and suffering, and that he was not in condition as yet to be thinking of lawyers, and of the outcome of his case, and that he was only thinking of getting well first; and that, if this man could come back in about 30 days or so, if your affiant was then feeling better, that he would be willing and glad to talk to him; that these two men then left the room, leaving with your affiant a number of business cards, with the name of Dahl & McDonald, attorneys at law, Minneapolis, Minn., thereon; that about four or five days later, and on or about the 28th day of February, 1923, one of these said men came back to the hospital again with a lot of fruit and candy, and visited with your affiant, and that, during the course of the conversation which was had between your affiant and this man, your affiant learned from him that the paper which he signed was a contract employing a firm of lawyers from Minneapolis to handle his case against the Duluth, Winnipeg & Pacific Railway Company; that your affiant immediately requested of this man to write to this other man in Minneapolis, and to the firm of lawyers in Minneapolis, and advise them not to do anything with his case, and to ask them to return to him the paper which your affiant signed; that your affiant waited for the return of said paper for about three or four days, and then. in order to make sure that no lawyer would start an action or do anything against the railway company, or do anything concerning his case, he called one of his friends at Duluth, Minn., and through him he executed a letter, of which the following is a true and correct copy, and had the same sent to Dahl & McDonald, attorneys at law, Minneapolis, Minn.:

"'Duluth, Minn., March 1st, 1923,

" 'Dahl & McDonald, Attorneys at Law, 327 Metropolitan Bank Bldg., 2nd Ave. & 6th St. South, Minneapolis, Minn.—Gentlemen: Last Sunday evening, February 25th, 1923, some one from your firm came to my room, 204 St. Mary's Hospital, Duluth, Minn., with a Greek fellow who runs a candy store at Superior, Wis., and at that time you have asked me through this Greek fellow to tell you how I got hurt, and you wrote it all down, and then you have asked me to sign a paper, which paper I did sign, thinking, of course, that it was a paper setting forth the facts as to how I got hurt. Yesterday, Feb. 28th, 1923, the same Greek fellow from Superior came to the hospital

again to see me, and after having a short conversation with him I have learned from him that the paper which I put my name to was not a statement of facts as to how I got hurt, and that, on the contrary, it was a contract employing you to handle my case against the railroad company. I did not intend to give you a contract employing you at that time, or at any other time prior thereto, and I hereby notify you and each of you that any and all supposed to be contracts and any and all contracts and agreements of every nature and description which I may have heretofore signed with your firm relating to my personal injury claim for damages against the Duluth, Winnipeg & Pacific Railway Company, or any other railroad company, for injuries which I have heretofore sustained, are hereby canceled, and you and each of you are hereby discharged and dismissed, and required not to do anything more about my case, and to dismiss any and all actions or proceedings taken by you in my said case. I would be very much obliged if you will send me back the paper which I signed, and, if I find in the future that I have to have the assistance of an attorney to handle my case, I shall be very glad to consider your firm. I have your card, and will make use of it if I see fit to do it. I do not want you to send somebody here to see me, because I am having enough suffering with my injuries and cannot afford to have an additional bother.

"'Yours truly,                          [Signed] George Chunes,
"'Room 204, St. Mary's Hospital, Duluth, Minnesota.'

"That said letter was registered, and about one or two days later your affiant received a return receipt of said letter, as requested by him, said receipt being signed by the firm of Dahl & McDonald; that thereafter, and prior to the 28th day of March, 1923, your affiant retained and employed Barton & Kamuchey, of St. Paul, Minn., attorneys at law, to bring and prosecute suit upon and represent affiant in the matter of his claim for damages against the Duluth, Winnipeg & Pacific Railway Company, arising from personal injuries received by him on the 15th day of February, 1923; that thereafter, and some time during the latter part of April, 1923, this same man from Minneapolis came back to the hospital and was with your affiant for a period of about two hours, trying to persuade him to withdraw his letter dismissing and discharging them, and to allow them to proceed with the prosecution of your affiant's case, and he then informed your affiant that they had started two lawsuits against the Duluth, Winnipeg & Pacific Railway Company. and asked your affiant to permit them to proceed with the said lawsuits which they had started; that your affiant again advised this man not to do anything concerning his case, and requested of him to dismiss any and all actions that he or they started against the Duluth, Winnipeg & Pacific Railway Company; that this man then left your affiant and has not been back since.

"Your affiant further states that he desires to have the firm of Barton & Kamuchey, of St. Paul, Minn., continue representing your affiant, and that they, the said Barton & Kamuchey, have authority from your affiant to bring and prosecute suit against the Duluth, Winnipeg & Pacific Railway Company for and on behalf of your affiant. Your affiant further states that all lawsuits brought against the Duluth, Winnipeg & Pacific Railway Company in any courts of the state of Minnesota, save and except only the lawsuit which was started for and on behalf of your affiant by the law firm of Barton & Kamuchey, of St. Paul, Minn., may be and hereby are dismissed without prejudice.                          George Chunes.

The affidavit of James Kontogianis is as follows:

"State of Minnesota, County of St. Louis, City of Duluth—ss.:

"James Kontogianis, being first duly sworn, upon oath deposes and says: That he now is, and for the last 20 months has been, a resident of the city of Duluth, Minnesota; that he is one of the trustees of the Greek Community in Duluth, Minn., and that his business is that of a restaurant; that he is a cousin of George Chunes, who is now in the St. Mary's Hospital, Duluth, Minn., receiving treatment for injuries which he sustained on or about the 15th day of February, 1923, and that he has known him practically

all of his lifetime; that he has very often called on George Chunes at the hospital, and that on the 28th day of February, 1923, he went to the said St. Mary's Hospital and called on George Chunes, and that at said time and place the said George Chunes informed him that one Robert J. McDonald came to the St. Mary's Hospital on Sunday evening, the 25th day of February, 1923, and secured his signature on a paper, presumably a statement of facts as to how George Chunes got hurt, and that he the said George Chunes was later informed that it was a contract of employment, and not a statement of facts; that said George Chunes was desirous of having the said supposed contract canceled, and to revoke any power or authority which could be claimed by virtue of the same, and to that end, and for that purpose he requested of your affiant to prepare a letter, addressing the same to Dahl & McDonald, of Minneapolis, Minn., advising them not to take any action in connection with his case, and to dismiss any and all lawsuits started by them; that pursuant to said request your affiant did on the 1st day of March, 1923, prepare a letter, which he took back to the St. Mary's Hospital for George Chunes to sign, and caused the same to be sent by registered mail to Dahl & McDonald, of Minneapolis, Minn., and requested that a return receipt be mailed to George Chunes at St. Mary's Hospital, Duluth, Minn.; that in the forenoon of about March 12, 1923, one Peter E. Kamuchey, of St. Paul, Minn., came to his place of business, and at said time and place informed him that he came to Duluth at the request of George Chunes, and that he was going to the St. Mary's Hospital to see him, and asked your affiant to go with him, which your affiant did not do, on account of matters on hand for his attention; that said Peter E. Kamuchey left your affiant's place of business and stated that he was going to the hospital to see George Chunes, and about 12 o'clock noontime of the said 12th day of March, 1923, he, the said Peter E. Kamuchey, returned and informed him that George Chunes had placed his case in the hands of Barton & Kamuchey, attorneys at law, St. Paul, Minn.; that the foregoing affidavit is made for the purpose of advising the court that the letter, dated Duluth, Minn., March 1st, 1923, and mailed to Dahl & McDonald, was not drawn up by Peter E. Kamuchey, as claimed by Robert J. McDonald in his affidavit of May 12, 1923, and that it was drawn up by your affiant at the request of George Chunes, and not otherwise.                James Kontogianis.

There was also submitted on the hearing a second affidavit, purporting to have been made by the plaintiff on the 21st day of May, 1923, which reads as follows:

"George Chunes, being first duly sworn, upon oath deposes and says: That he is now, and since the 15th day of February, 1923, has been, in the St. Mary's Hospital at Duluth, Minn., receiving treatments for injuries which he sustained on the said 15th day of February, 1923, at the town of Bartlett, Minn., while working as a section hand for the Duluth, Winnipeg & Pacific Railway Company; that he has read a copy of the affidavit made by one Robert J. McDonald on May 12, 1923, and thoroughly understood its contents; that he reaffirms each and all of the statements set forth in his affidavit of May 11, 1923, and makes them a part hereof, and in addition thereto he respectfully states to the court: That he did not, on the 26th day of February, 1923, nor at any other time thereafter, sign a contract with the law firm of Dahl & McDonald, of Minneapolis, Minn., employing them to recover damages for him from the said Duluth, Winnipeg & Pacific Railway Company, and that he only signed a paper on Sunday, February 25, 1923, about 8 o'clock p. m. of said date, and not on the 26th day of February, 1923, which paper he understood to be a statement of facts as to how the accident happened, and not a contract of employment, and that as soon as he was informed that that paper was a contract of employment, and not a statement of facts, he immediately proceeded to and did have the same canceled, and he did on the 1st day of March, 1923, revoke any power or authority that the said Dahl & McDonald may have had by virtue of the said supposed contract; that from and after the said 1st day of March, 1923, up to and including the date of the making of this affidavit,

he did not either verbally or otherwise give the said Dahl & McDonald any authority whatever to represent him in any way or to take any action at all in the matter of his claim for damages against the said Duluth, Winnipeg & Pacific Railway Company, and that, whatever lawsuits were brought by the said Dahl & McDonald against the said Duluth, Winnipeg & Pacific Railway Company, they were brought without any authority from this affiant, and without his consent; that from and after the said 1st day of March, up to and including the date of this affidavit, Robert J. McDonald did not call on your affiant on various occasions as stated by him in his affidavit of May 12, 1923, and in fact he only called on your affiant once, some time in the latter part of April, 1923, and informed him of two lawsuits which the firm of Dahl & McDonald brought against the Duluth, Winnipeg & Pacific Railway Company, and asked him for authority to proceed with said lawsuits, and your affiant refused to give him any authority, and did at said time and place advise the said Robert J. McDonald to dismiss the said lawsuits and not to take any further action in his case, and that he, this affiant, did then and there inform Robert J. McDonald that he had already placed his case in the hands of Barton & Kamuchey, attorneys at law, St. Paul, Minn., and that he, your affiant, did not at that time or any other time heretofore inform the said Robert J. McDonald that he did not want Barton & Kamuchey take any action in his case and that he had so informed them; that because of the injuries so received by your affiant on February 15, 1923, he was unable to do any writing until about the 9th day of March, 1923, and at that time he did write a letter to Peter E. Kamuchey, at St. Paul, Minn., asking him to come to the St. Mary's Hospital at Duluth, Minn., and that in the forenoon of March 12, 1923, the said Peter E. Kamuchey did call on your affiant, and at said time and place your affiant did sign a contract employing Barton & Kamuchey, attorneys at law, to handle his case, the following which is a true and correct copy:

" 'Telephone Cedar 1099.                                    Humphrey Barton.
                                                        " 'Peter E. Kamuchey.
                    " 'Barton & Kamuchey, Attorneys at Law,
                    " '816–818 Exchange Bank Bldg., St. Paul, Minn.

" 'I hereby retain and employ Barton & Kamuchey, of St. Paul, Minn., as attorneys at law, to bring and prosecute suit upon and represent me in the matter of my claim for damages against Duluth, Winnipeg & Pacific Ry. arising from personal injuries received by me at or near Bartlett, Minn., through the negligence of said company, on the 15th day of February, 1923, and agree to pay them a sum equal to one-third of the amount received from said company by me on account of said injuries, either by suit or settlement, but no settlement of said claim shall be made by said attorneys without first securing my consent thereto.
                                            " 'George Chunes, Claimant.

" 'We hereby accept the above claim and cause of action, and agree to prosecute the same to settlement or judgment, on the terms above set forth.
                                    " 'Barton & Kamuchey, by P. E. Kamuchey.

" 'Dated at Duluth, Minn., this 12th day of March, 1923.'

"That from and after the said 12th day of March, 1923, up to and including the date of this affidavit, your affiant never did want and never did inform the said Barton & Kamuchey not to take any action in his case, and on the contrary he always wanted to and still wants the said Barton & Kamuchey to continue with the prosecution of this case. Your affiant denies that the said Peter E. Kamuchey drew up a dismissal, or that he had him sign one, or that he caused one to be mailed to Dahl & McDonald, or that he had anything to do with the drawing up of said dismissal on the 1st day of March, 1923, or on any other date heretofore, and respectfully states to the court that the dismissal mentioned and referred to in the affidavit of Robert J. McDonald of May 12, 1923, was requested by your affiant and was prepared for him by one James Kontogianis, a cousin to this affiant, and was mailed by him, the said James Kontogianis, to Dahl & McDonald, and that the first time in about six months that your affiant saw Peter E. Kamuchey was on the 13th day of March, 1923.

"Your affiant further states: That the said Peter E. Kamuchey called on him on various occasions since March 12, 1923, and that at no time did he make any statements to your affiant that Dahl & McDonald were not reliable, and that when said Peter E. Kamuchey was asked about Dahl & McDonald the only statement he made was: 'I am not personally acquainted with either Mr. Dahl or Mr. McDonald. I have heard of them and that is all.' That the foregoing is made for the purpose of showing the court that the firm of Dahl & McDonald had no authority to start any lawsuits against the Duluth, Winnipeg & Pacific Railway Company, and therefore your affiant prays that said actions be dismissed without prejudice, and that the firm of Barton & Kamuchey did have authority to start a lawsuit against the said Duluth, Winnipeg & Pacific Railway Company, and still have authority from your affiant to continue with the prosecution of said lawsuit, and your affiant prays that that be the only one left pending, and that all other lawsuits be dismissed without prejudice.       George Chunes.

In rebuttal there was submitted the affidavits of Robert J. McDonald and P. Hom, sworn to on the 6th of June, 1923, and of James Copouls, sworn to on the 7th of June, 1923, and in surrebuttal there was submitted a third affidavit, purporting to be that of the plaintiff, which on its face was subscribed and sworn to on the 21st of June, 1923. The McDonald affidavit of June 6th is as follows:

"State of Minnesota, County of Hennepin—ss.:

"Robt. J., McDonald, being first duly sworn, upon oath deposes and says that the affidavit of plaintiff herein was duly served upon the office of Dahl & McDonald by the firm of Barton & Kamuchey on the 4th day of June, 1923; that affiant has fully read the affidavit of plaintiff herein, and, answering said affidavit, affiant denies all of the allegations in said affidavit contained, and each and every part and portion thereof, except that which is hereinafter admitted or otherwise modified.

"Affiant specifically denies that, at the time said contract of employment between plaintiff and Dahl & McDonald was entered into, said plaintiff was under severe pain and suffering, and the paper which was signed by plaintiff was held by some one, and the bigger portion of same was covered up, and that said paper was a statement of facts as to how plaintiff sustained his injuries, as alleged in said affidavit, and in support of the denial of these allegations affiant shows the following statement of facts to the court:

"Affiant states that in the latter part of February, 1923, he was informed that plaintiff was injured and was at a hospital in Duluth, Minn., and that plaintiff was desirous of having attorneys take care of his case; that on or about the 26th day of February, 1923, affiant went to the city of Duluth for the purpose of seeing the plaintiff herein; that affiant was informed that plaintiff could not speak the English language very well, and was of Greek nationality; therefore your affiant went to Superior, Wis., and arranged with James Copouls, who is also of Greek nationality, and who can speak that language fluently, to go to the hospital with affiant to see plaintiff regarding his case; that before going to the hospital your affiant also arranged for P. Hom, of Duluth, to go to the hospital with affiant; that affiant, P. Hom, and James Copouls went to the hospital to see the plaintiff herein; that affiant had never met the plaintiff before this time; that plaintiff was in a private room at said hospital; that affiant, Hom, and Copouls entered the room of the hospital together, and immediately upon entering plaintiff at once recognized and indicated that he knew James Copouls, and plaintiff and James Copouls immediately started to speak to each other in Greek; that immediately thereafter said Copouls introduced affiant to plaintiff; that plaintiff appeared to be in good spirits, did not seem to be suffering any pain, and acted as though he was rational; that affiant had James Copouls interpret to plaintiff the fact that Dahl & McDonald would take care of his case on a contingent basis of one-third of the amount of recovery; that after a short conversation between Copouls and plaintiff in Greek plaintiff expressed his willingness to employ Dahl & McDonald to take care

of his case, whereupon your affiant duly made out a contract, executed in duplicate, and gave both contracts to Copouls, who handed said contracts to plaintiff, whereupon plaintiff signed both of said contracts; that, in addition to the signing of the contracts, said Copouls explained fully to plaintiff the conditions of the contract, and plaintiff indicated that he knew all about the same before signing; that up to this time nothing had been said regarding the seriousness of plaintiff's injuries, because your affiant had been informed prior thereto as to the extent of plaintiff's injuries, and nothing was said up to that time regarding the manner in which the accident occurred, or anything regarding the liability of the case; that after the signing of the contracts plaintiff gave his copy of the contract to James Copouls, and asked that he keep same at his place of business at Superior, because he did not want same left in the hospital for fear it would be lost or taken from him; plaintiff informed said Copouls that he would get same from him as soon as he was out of the hospital; that after the signing of the contracts affiant took a statement of facts from said plaintiff, and drew a diagram of the various locations of the tracks, and had plaintiff indicate just how the accident occurred fully, and plaintiff gave affiant the names of witnesses and other necessary information; that said plaintiff did not, or was not asked to, sign the statement of facts concerning the accident; that, after taking said statement of facts, plaintiff removed the covers from the bed and exhibited his injuries, showing his condition to affiant fully; that after some conversation regarding the amount plaintiff could expect to recover, and just how the witnesses in the case could be reached, and their statements obtained, affiant, Copouls, and Hom shook hands with plaintiff and left the hospital; plaintiff at that time seemed well satisfied with the making of the contract, and informed affiant he would not give any one any information regarding the accident, or give the claim department any statement, or disclose any facts that might in any way impair or injure his case, and that he would keep affiant informed at all times as to what was going on; that plaintiff asked affiant if he would arrange to have him moved to the city of Minneapolis as soon as possible, because he did not want to stay at the hospital at Duluth any longer than necessary, and affiant informed plaintiff that as soon as his condition would permit he would remove him to Minneapolis; that upon first entering the room plaintiff did not act as though he could speak English, or understand same very well, but after the signing of the contract, when it come to getting all of the facts regarding the accident from plaintiff, he seemed to understand and speak the English language very well, and informed affiant the next time he came to see plaintiff it would not be necessary to bring an interpreter, as he could understand and speak English fairly well; that, while affiant was in the room, a staff doctor entered and asked plaintiff how he was feeling, and he informed said doctor that he was feeling fairly good, and that he did not require any attention; that affiant asked the doctor how plaintiff was getting along, and the doctor informed affiant very well, in fact, much better than he had expected; that thereafter affiant caused an investigation to be made regarding the accident, and the facts were found to be substantially true as to what plaintiff informed affiant of, whereupon affiant duly commenced an action against said defendant for plaintiff's benefit: that thereafter a registered letter was received by Dahl & McDonald, signed by plaintiff, which is the letter set out in plaintiff's affidavit, and after the receipt of same affiant went to Duluth to see plaintiff, and questioned him concerning same; at first plaintiff informed affiant that he did not know anything about the letter, later that he thought one of the nurses or doctors in the hospital had sent same at the request of the claim agent, and that he did not know very much about it, but later in the conversation admitted the same was mailed under the directions and at the instigation of Barton & Kamuchey, of St. Paul; plaintiff informed affiant at that time that Kamuchey had been to see plaintiff in the hospital a few days after affiant obtained said contract, and Kamuchey came from or was raised in Greece at or near the same town plaintiff was, and further informed affiant that Kamuchey informed plaintiff that Dahl & McDonald would be unable to properly control his case, that they were not reputable at-

torneys, that they could not be relied upon (or words to that effect); that, owing to the fact that mostly all of the witnesses in the case would be of Greek nationality, Dahl & McDonald would be unable to get them to testify, but that he (Kamuchey) would, because he was of Greek nationality; that said Kamuchey informed plaintiff that he would be better off to trust his case to Barton & Kamuchey, because he could rely upon them, and they would not work with the railroad company, but that Dahl & McDonald would, and that plaintiff informed affiant that on account of the charges made by Kamuchey he was induced to and did sign a contract with them, and did consent to the dismissal, and after going over same fully, plaintiff stated he was sorry for the action he had taken, because he realized it was not right, and that since he had taken this action he had been advised by other Greeks that he could not rely upon Kamuchey, and instructed affiant to continue with the case and disregard the dismissal; that said consent of plaintiff to proceed with the case was voluntary upon the part of plaintiff and was not under persuasion, as alleged in plaintiff's affidavit, and plaintiff advised affiant at that time that he would not have anything further to do with Barton & Kamuchey, and wanted affiant to remove plaintiff to Minneapolis at once, but affiant informed plaintiff at that time that he could not be moved, because it might impair his condition; that since said time affiant has been in Duluth a number of times, and has called to see plaintiff, and at all times he has been in good spirits, has talked freely about his case, and has stated at all times that Barton & Kamuchey have not been near him; that he is glad that he has done what is right in the matter. and has at all times indicated that Dahl & McDonald were to proceed with his case; that after the issuance of this order to show cause affiant went to the hospital to see plaintiff again, and informed plaintiff that Barton & Kamuchey had taken action, and requested that plaintiff dismiss Barton & Kamuchey, whereupon plaintiff informed affiant that he did not know what he would or could do, and acted somewhat indignant, and stated that Kamuchey had been to see some of his friends, and he was afraid that, if he dismissed Barton & Kamuchey from the case, that the witnesses would not testify for him, because he had been informed some of them were friends of Kamuchey; that when he got out of the hospital he would immediately come to Minneapolis, and did not know just what action he would take, but to leave the matter stand as it was.

"The above sets forth practically all of the facts in connection with the above action, and should show fully that Barton & Kamuchey, through Kamuchey, induced plaintiff by false misrepresentations and inducements, as above set forth, to take the action herein referred to solely for the purpose of enabling Barton & Kamuchey to handle this litigation, and not for the benefit of plaintiff. Affiant further makes the affidavit of the 12th day of May, which is on file in the above-entitled action, a part hereof, as though the same were fully set forth at length.         Robt. J. McDonald.

The affidavit of P. Hom, referred to, reads as follows:

"State of Minnesota, County of St. Louis—ss.:

"P. Hom, being first duly sworn upon oath deposes and says that at the city of Duluth on or about the 26th day of February, 1923, at the request of Robt. J. McDonald, attorney of Minneapolis, Minn., and in company with James Copouls, of Superior, Wis., he went to the hospital to see George Chunes, who had been injured in a railway accident; that said George Chunes was in a private room at said hospital, and immediately upon entering the room of said hospital said George Chunes seemed to recognize James Copouls, who shook hands with George Chunes and immediately engaged in conversation in Greek; that immediately thereafter said James Copouls introduced said McDonald to said George Chunes, and the said James Copouls was acting as an interpreter for the said McDonald, and interpreted to George Chunes the terms and conditions under which Dahl & McDonald would handle his case against the railroad company; that your affiant cannot speak or understand the Greek language, but did hear what McDonald had James Copouls interpret to said Chunes, and Chunes seemed

to fully understand everything that was being said to him, and he expressed his willingness to give his case to Dahl & McDonald, whereupon said McDonald made out a contract, executed in duplicate, and handed same to Copouls, who in turn explained fully by reading the contract over to George Chunes, and thereafter said George Chunes signed both contracts, handing one to McDonald and handing one back to Copouls, asking said Copouls that he keep same for him until he was out of the hospital; that said Chunes asked questions regarding the amount he could expect to recover, talked about being taken to Minneapolis, and about the expense of litigation; that after the contract was signed, McDonald asked a number of questions, which he wrote down, concerning the facts in the case and the injuries, got the names of witnesses, etc., and Chunes exhibited and displayed his injuries to McDonald; that McDonald did not have said Chunes sign anything, except the contract, and that the statement of the facts concerning the accident was not signed by George Chunes, and a short time thereafter all present shook hands with George Chunes and left the hospital; that said Chunes seemed to be in good spirits, did not seem to be suffering any pain or agony, and indicated that he understood fully the entire transaction; that the said Chunes conducted part of the conversation in English and part in Greek; that he seemed to know James Copouls very well, and acted as though he did; that while at the hospital a staff doctor entered the room, and said George Chunes informed him he was feeling much better, or words to that effect; that your affiant has read the affidavit of George Chunes, and that the same is not true, except that part, if any, which is consistent with this affidavit; that your affiant has read the affidavit of Robt. J. McDonald and James Copouls, and states that the same is true and correct in so far as such statements are made wherein this affiant was present.

"Paul J. Hom.

### The affidavit of James Copouls, of June 7th, is as follows:

"State of Wisconsin, County of Douglas—ss.:

"James Copouls, being first duly sworn, upon oath deposes and says that he lives at Superior, in the state of Wisconsin; that he has a brother by the name of John Copouls residing in the city of Minneapolis, and that Robt. J. McDonald, attorney at Minneapolis, Minn., represented his brother at Minneapolis in litigation pending there; that on or about the 26th day of February, 1923, the said McDonald called to see affiant at the city of Superior, introduced himself to affiant, and asked that affiant go to the city of Duluth and act as interpreter for him; that said McDonald informed affiant that George Chunes had been injured while working for the Duluth, Winnipeg & Pacific Railway Company, and was seriously injured, and was in a hospital at Duluth, and was desirous of having Dahl & McDonald handle his case, and that said McDonald wanted your affiant to act as an interpreter for him, because he had been informed that said George Chunes could not speak the English language very well; that your affiant is of Greek nationality, and can interpret and speak the Greek and English language fluently; that your affiant, accompanied by McDonald and one P. Hom, who was introduced to affiant by the said McDonald, went to the hospital to see George Chunes; that said George Chunes was in a private room in said hospital, and immediately upon entering the room with McDonald and Hom, your affiant recognized the said George Chunes, having met him somewhere before, shook hands, and immediately started to talk to him, whereupon your affiant immediately introduced McDonald and Hom to the said George Chunes, and told him of their mission; that your affiant informed said George Chunes that the firm of Dahl & McDonald were good lawyers, could take care of his case properly, and he thought it best that he employ some good law firm to take care of his case; that said McDonald informed affiant on what basis they would take charge of the case, whereupon your affiant interpreted the same to Chunes; thereupon your affiant was informed by said Chunes that he would let Dahl & McDonald take charge of his case; that McDonald made out two contracts, handed both of them to your affiant, who in turn handed them to George Chunes; that your affiant read them

over carefully, and explained fully to the said George Chunes the contents of said contract, and after so doing said Chunes sat up partly in bed and signed both contracts, handed one back to McDonald, and handed the other one to your affiant, and requested that affiant keep same for him until said Chunes would be discharged from the hospital; that up to the time of the signing of this contract nothing was said about the extent of the injuries of said George Chunes or the liability in the case, or anything regarding how the accident happened; that the said George Chunes seemed perfectly satisfied to give the case to Dahl & McDonald, and informed your affiant that, if he would recommend them, which affiant did, he knew they were all right; that at the time of the signing of said contract your affiant fully explained in detail how the case would be handled by Dahl & McDonald the amount they were to charge, and the expense of conducting the lawsuit, and the amount they probably could recover for plaintiff; that the contract, when signed, was fully displayed and exhibited to George Chunes, and he knew fully what it contained before signing same, and signed the same willingly and freely; that after the signing of said contract said McDonald asked a number of questions concerning the accident and the injuries of said George Chunes, which were all answered by the said Chunes, either in Greek or in English, said Chunes understanding mostly all of them, and answered a great many of the questions before your affiant would interpret them to George Chunes in Greek; that said George Chunes informed the said McDonald of all witnesses and details and gave all the information requested; that he seemed to be in good spirits, not suffering any severe pain, and was rational at all times; that while affiant, McDonald, and Hom were in the room talking to plaintiff a staff doctor came in the room and asked George Chunes how he was feeling, and he informed the doctor he was feeling all right; that he appeared to be in good spirits and said it would only be a matter of a short time and he would be out of the hospital. Plaintiff further requested that as soon as he was able to be removed from the hospital he wanted McDonald to have him removed to Minneapolis, and wanted to know if McDonald would agree to advance him some money if he needed same before his case was settled, and McDonald informed affiant at that time that he would advance him any money in the event same was necessary; thereafter McDonald took the statement of the facts from George Chunes, and did not have him sign the same and the only paper that was signed by Chunes was the contract of employment; that before leaving the hospital your affiant asked George Chunes if there was anything he could do for him, and Chunes told him, if there was, he would let him know; that your affiant is in business in the city of Superior, and has been in business there for some time, and that he is not interested in the firm of Dahl & McDonald, and not interested in the outcome of this litigation; that he was only acting as an interpreter to assist plaintiff in getting what money he could from the railroad company, and doing all he could for plaintiff's best interests only, and that in doing so he acted fairly and impartially and for the interest of George Chunes.

"Affiant has read the affidavit hereto attached by P. Hom and Robt. J. McDonald, and alleges that the same is true of his own knowledge as to matters wherein he was present; that your affiant has read the affidavit of George Chunes, which is not attached hereto, and that the same is not true, except wherein the same is consistent with this affidavit.

"Further affiant sayeth not. James Copouls.

It is very difficult to deal temperately with the situation disclosed by the foregoing affidavits. If the first affidavit of Robert J. McDonald is true, then, as above stated, the firm of Dahl & McDonald was authorized to bring one of the two cases commenced by them. If the first affidavit of the plaintiff is true, the authority was obtained by Robert J. McDonald by falsehood, fraud, and deceit. If the plaintiff's second and third affidavits submitted on the motion herein be true, McDonald committed perjury in making the two affidavits made

by him herein; and, if the second McDonald affidavit be true, the plaintiff committed perjury in making the affidavits submitted by him, and the attorneys who induced him to make those affidavits are guilty of subornation of perjury. The situation described in the affidavits is one calculated to make any one with a love for the legal profession blush with shame, and apparently is the natural resultant and product of the very demoralizing practice which has grown up in the legal profession in the large cities, and which has done so much to debase and degrade the honorable profession of the law.

In the condition of the proof bearing upon the question of the authority of the two firms of attorneys mentioned to institute the various actions referred to herein, I am unable to find that either firm had any authority to institute any of the actions mentioned, and this results from the doubt that exists in my mind as to the reliability of the testimony offered, and leads to the order made herein dismissing the three actions mentioned. On the hearing of the motion herein, Mr. McDonald charged Mr. Kamuchey with being an "ambulance chaser," and the latter indignantly repelled the charge saying, "Kamuchey does not have to do any ambulance chasing where the injured party is a Greek," leaving in doubt just what his position with reference to ambulance chasing is in the event that the nationality of the injured party was other than Greek.

[2] On the hearing of the motion to remand, in which his firm represented the plaintiff in another personal injury case heard about the same time, Mr. McDonald was charged by the opposing attorney with practicing "ambulance chasing," and replied, admitting the fact. In answer to a question from the court if he realized the nature of the admission he had just made, he replied: "Of course I do. It is the truth, and why not admit it?" At a later date, to which the hearing was adjourned, at which Mr. Dahl was present and Mr. McDonald absent, the court called Mr. Dahl's attention to the admission made by Mr. McDonald that his firm practiced "ambulance chasing." Mr. Dahl replied that his firm had as much right to indulge in that practice as the defendant's attorneys had to chase after the plaintiffs and their witnesses in such cases.

There does not seem to be the slightest thought on the part of any of the attorneys mentioned that the practice referred to is in violation of the ethics of the legal profession and brands those who indulge in it with professional infamy. With reference to this practice the Circuit Court of Appeals of the Eighth Circuit, in a case on appeal from this court, said:

"The situation presented in the railroad company's bill in the state court is undoubtedly aggravating, and may merit the attention of Bar Associations and possible action by the courts to prevent unethical practice of the law, but that is not a matter that this court can remedy on this appeal." Chicago, M. & St. P. Ry. Co. v. Schendel, 292 Fed. 326, 330.

The bar of Minnesota has always maintained a high moral and professional standard, and has always jealously guarded its good name. The attorneys mentioned herein are all members of the bar of the Supreme Court of the state of Minnesota, and were admitted to practice in this court on the strength and faith of the certificates issued to

'them by the Supreme Court of Minnesota, and it is thought by the three judges of this court that a copy of the record in this case, together with a copy of this memorandum, ought to be transmitted to the State Board of Law Examiners of the state of Minnesota for such action as to that body may seem appropriate.

The clerk of this court will therefore transmit to the State Board of Law Examiners of the state of Minnesota a copy of the record herein, with a copy of this memorandum. It is ordered that the three actions mentioned herein, for the reasons hereinbefore stated, be and the same are hereby dismissed.

It is so ordered.